ORIGINAL

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

FILED
IN CLERK'S OFFICE
U S DISTRICT COURT E.D.N.Y.
★ MAY - 8 2012 ★
BROOKLYN OFFICE

STEPHEN KOVACS,

        Petitioner,

-against-

UNITED STATES OF AMERICA,

        Respondent.

CV12 2260

NO SUMMONS ISSUED

Case No.

WEINSTEIN, J

PETITION FOR A WRIT OF ERROR
CORUM NOBIS

GO, M.J.

    Petitioner Stephen Kovacs, through his undersigned attorneys, submits this Petition for a writ of error corum nobis to vacate his conviction and sentence entered on December 18, 2001 in the Eastern District of New York by the Honorable Leonard D. Wexler in the matter captioned *United States v. Kovacs*, No. 9:96-cr-00895.

## SUMMARY OF THE ACTION

    1.    Mr. Kovacs, a citizen of Australia, was charged in 1996 with conspiracy and wire fraud for his role in an insurance fraud perpetrated by Elliott Zerring, a claims adjustor who has been convicted for fraudulently stealing tens of millions of dollars through his submission of hundreds of fraudulent insurance claims. In connection with these crimes, Mr. Zerring pled guilty to two counts of wire fraud and one count of tax evasion and was sentenced to five years probation.

    2.    In 1991, Mr. Kovacs was solicited by Mr. Zerring and agreed to submit a fraudulently inflated insurance claim in connection with an actual loss that Mr. Kovacs had

suffered. Prior to that agreement, Mr. Kovacs was a law-abiding businessman who had never been arrested. Mr. Kovacs accepted responsibility for his unfortunate conduct, pleading guilty to a reduced charge of misprision of felony on November 24, 1999. He was subsequently sentenced to five years probation. As his Rule 11 plea colloquy makes clear, Mr. Kovacs was explicitly advised by his attorney at the time he entered the plea that the crime to which he was pleading guilty--misprison of felony--would carry no immigration consequences. Unfortunately, this legal advice on which Mr. Kovacs relied in entering the plea has proven to be tragically erroneous, and resulted in horrendous consequences for him and his family.

3. For years following his 1999 plea, Mr. Kovacs repeatedly entered and exited the United States with the express permission of the court. His travel was necessary because Mr. Kovacs's business requires him to travel to Europe and Asia multiple times each year. In 2009, however, after he had completed his probationary sentence without incident and paid the $600,000 of restitution ordered by the Court, Mr. Kovacs was stopped for the first time by the Department of Homeland Security upon his re-entry into the United States after one of his routine business trips. Contrary to the legal advice on which he had relied, Mr. Kovacs subsequently learned that the Federal government classifies misprision of felony as a crime rendering an alien inadmissible to the United States.

4. As the Court held at sentencing, Mr. Kovacs's conviction arose out of an aberrant act in an otherwise law-abiding life--an act for which Mr. Kovacs took extraordinary responsibility because his guilty plea was entered despite a meritorious statute-of-limitations defense. However, notwithstanding his acceptance of responsibility for his actions, Mr. Kovacs would not have accepted the government's plea offer if his counsel had given him correct legal advice relating to its immigration consequences. Instead, he would have specifically instructed

his counsel to negotiate a plea that carried no immigration consequences--which he had done and thought he had accomplished through the government's offer that he plead guilty to the reduced charge of misprision of felony. In the alternative, Mr. Kovacs would have litigated the viability of his statute of limitations defense.

5. Now a decade later, as a result of his reliance on his counsel's erroneous legal advice, Mr. Kovacs is unable to enter the United States, where he had resided since 1977, started and maintains a successful business, and raised his family. He must now live apart from his wife, children, and grandchild, all of whom are law-abiding United States citizens living in the United States.

6. Finally, there is no dispute in this action that Mr. Kovacs's was in fact given erroneous legal advice. His prior counsel has admitted that fact and submitted an affidavit reflecting it in support of Mr. Kovacs's petition. Because he was prejudiced by the ineffective assistance of his prior counsel, Mr. Kovacs respectfully asks that this Court issue a writ of error coram nobis vacating his conviction and sentence.

## BACKGROUND

### I. Mr. Kovacs's Family History

7. Mr. Kovacs, who is 60 years old, was born in Australia on May 25, 1951 to two Hungarian Jewish Holocaust survivors, Michael Kovacs and Kathleen Goldstein Kovacs. Most of Mr. Kovacs's extended family was killed in the Holocaust, and Mr. Kovacs lived with his family in a community of Holocaust survivors until he was 22.

8. Outside of their community, Mr. Kovacs's family continued to suffer from significant anti-Semitism, but at home they developed a tight-knit bond. Mr. Kovacs was crippled by polio at two years old, and doctors told his parents that he would never walk without a crutch. But Mr. Kovacs's father massaged his son's paralyzed foot every night, and eventually

3

, Mr. Kovacs was able to walk unassisted as a child.

9. Mr. Kovacs attended a vocational college for two years, but left before obtaining a degree. At the age of 22 he moved from Australia to England to work in the family's newly established jewelry business, which his father had started with money he had saved from his wages over the years from his work as a butcher. Beginning with a small meat company, Mr. Kovacs father then opened a canned food business, and later a jewelry company in England.

### II. Mr. Kovacs's Home in the United States

10. In 1977, four years after joining his family's business in England, Mr. Kovacs immigrated and became a permanent resident of the United States. Mr. Kovacs subsequently founded and now runs his own jewelry business, International Bullion and Metal Brokers (USA), Inc., which is a successful private-label jewelry distribution and design company based in Florida. Mr. Kovacs grew that business from a one-man operation that he ran out of his apartment to a business that now employs approximately 100 people and annually pays millions of dollars in Federal taxes. The success of his business has been attributable to Mr. Kovacs's own hard work, year after year. Mr. Kovacs's care and pride for his company extends to his employees who he treats like extended family: he has provided many with interest-free loans, employed many of their relatives, and sponsored them for United States citizenship, all to help ensure that they could build successful lives in the United States, as he had.

11. In 1978 Mr. Kovacs married Gaye Wright, a naturalized U.S. citizen. They raised two children, Drew and Gavin, both born in the United States and now 31 and 29 years old, respectively. Drew graduated from Haverford College with a degree in political science in 2003. Following college, he enlisted in United States Army and enrolled in officer candidate school, but was subsequently discharged under the now defunct "don't ask don't tell" policy. Drew then attended New York Law School, graduating in 2008, after which he became associated with the

law firm of WilmerHale. Drew prematurely left his successful legal career at WilmerHale in order to help run his family business after his father was not allowed back into the United States in 2009. Moreover, his partner, Justin, remains in New York, and Drew must split his time between his life in New York with Justin and the family business in Florida.

12. Gavin, Mr. Kovacs's other son, suffered from arthrogryposis, a congenital deformity that left him without a left pectoral muscle. Gavin depended on his father for the emotional and physical support necessary to endure intense corrective surgery and rehabilitiation. In this regard, their relationship has been much like Mr. Kovacs's relationship with his own father. Gavin had not succeeded academically like his brother, but with the support of his tight-knit family, he managed to overcome many challenges. He is now a happily together with his partner, Jennifer, with whom he has a ten-month-old son, Ezra. Gavin works with his brother to run the family business in Florida in their father's absence. Like Drew, Gavin has been required to split his time between Florida and New York, where Jennifer resided, until she gave up her own career to be with Gavin and accommodate the demands of running Mr. Kovacs Florida-based family business.

13. Notwithstanding the difficulties his inability to reenter the United States has caused Mr. Kovacs, he remains exceptionally close with his children. But, they can rarely visit him in Australia, where he has been residing over the last three years without the support of any family. Mr. Kovacs's sons built their lives in the United States and must now help run the family business. As a result, they can only rarely see their father.

14. Because he cannot enter the country, Mr. Kovacs's was not present for the birth of Ezra, his only grandchild, who was born with severe bilaterial club foot. Because of this affliction, his family has not yet been able to take Ezra to visit Mr. Kovacs in Australia. Mr.

5

. Kovacs was only recently able to see Ezra for the first time by arranging a trip to the Caribbean, an area close to the doctors that Ezra must see regularly.

15. Mr. Kovacs's wife, Gayle, now is forced to split her time between her children and grandchild in the United States and her husband abroad. As such, Mr. Kovacs spends much of his time in Australia alone.

### III. Mr. Kovacs's Participation in Mr. Zerring's Fraudulent Scheme

16. Mr. Kovacs's participation in Mr. Zerring's criminal scheme is described in the Presentence Investigation Report ("PSI Report"):

> Stephen Kovacs owns International Bullion and Metal Brokers, USA, Inc., located in New York, New York. During . . . 1991, Kovacs' company was burglarized, with a loss of $250,000. Subsequent to the burglary, Kovacs reported the loss to his insurance company, Hanover Insurance, which sent a public adjustor to assess the loss. However, the public adjustor who arrived at International Bullion and Metal Brokers, USA, Inc., Eliot Zerring, was corrupt. Zerring advised Kovacs that with his cooperation, the loss could be assessed at $850,000. Kovacs then attended meetings with Zerring during which the scheme was discussed. Kovacs was to supply documentation which included inventory numbers of items taken during the burglary, but the documentation also included inventory items which were fraudulently included so that the loss amount could be increased.[1]

17. Mr. Kovacs initially refused to participate in Mr. Zerring's scheme, but was persuaded to do so after Mr. Zerring refused to represent him without inflating the claim. Mr. Zerring explained that claims were routinely inflated in order to properly compensate insureds for actual losses because otherwise insurance companies would pay only a fraction of the actual loss. Mr. Kovacs accepted this explanation and, like hundreds of others, was convinced to

---

[1] The PSI Report reflects several factual errors. For example, it incorrectly describes the robbery as having taken place in November 1991, when it in fact took place in May 1991. It also incorrectly states that Mr. Kovacs's claim was submitted on October 8, 1991 and that payment was issued on January 7, 2000. In fact, the proof of loss was submitted, and his fraudulent claim was paid, in September 1991, more than five years prior to Mr. Kovacs's indictment.

6

submit a fraudulently inflated claim at the level Mr. Zerring suggested.

18. The breadth of Mr. Zerring's wide-ranging criminal scheme was described in detail in Chubb & Son, Inc v. Kelleher, a civil action filed against him. *See* No. 92 CV 4484, at 3 (E.D.N.Y. Oct. 22, 2010) (report and recommendation adopted on March 7, 2011) (attached as Ex. XX to Pet.). In that action, Mr. Zerring was found liable for filing fifteen fraudulent insurance claims totaling $7,381,935.55. *See id.* In a separate, criminal proceeding, Mr. Zerring testified that "he and others at Interstate were involved in submitting 'probably hundreds' of fraudulent insurance claims and regularly bribing insurance company employees and experts. His partner, Robert Greenberg, has stated that approximately one-third of the insurance claims handled by Interstate were fraudulent." *Id.* at 4 (citations omitted). In addition to generally participating in the fraud of the company, Mr. Zerring "personally commit[ed] dozens of acts of mail and wire fraud." *Id.*

19. Mr. Zerring was indicted in 1993 with two counts of mail fraud and one count of tax evasion, though not for the relatively minor fraudulent claims he convinced Mr. Kovacs to submit. *See id.* at 3 & n.4. On information and belief, Mr. Zerring was never charged for the fraud perpetrated against Mr. Kovacs's insurer. On information and belief, he was eventually sentenced to five years probation.

### IV. Procedural History

20. Mr. Zerring submitted Mr. Kovacs's fraudulent proof of loss in September 1991, and the claims were paid later that month. More than five years later, on October 4, 1996, Mr. Kovacs was charged with conspiracy and wire fraud in violation of 18 U.S.C. §§ 371 and 1343.

21. Notwithstanding a meritorious statute of limitations defense, Mr. Kovacs pled guilty--because he was guilty--on November 30, 1999 to the reduced charge of misprision of felony under 18 U.S.C. § 4 for his failure to report a conspiracy to commit wire fraud. On

December 3, 2001, Mr. Kovacs moved for a downward departure on the grounds that (i) his unlawful conduct was an aberrant act in an otherwise law-abiding life; (ii) his incarceration would result in his approximately one hundred employees losing their jobs, and (iii) he had demonstrated an extraordinary acceptance of responsibility by entering a plea of guilty notwithstanding his meritorious statute-of-limitations defense. On December 18, 2001, the Court granted Mr. Kovacs's motion for downward departure on those grounds, sentencing him to five years probation and ordering him to pay $600,000 in restitution.

22. By August 8, 2002, Mr. Kovacs had paid the restitution in full. This restitution was paid primarily out of Mr. Kovacs's savings, as $400,000 of the $600,000 of fraudulent proceeds that he had received had been paid to Mr. Zerring as part of the scheme to which Mr. Kovacs agreed. Mr. Kovacs complied with all conditions of his probation and, on October 13, 2006, the Court granted his motion for early termination of probation.

### V.    The Erroneous Legal Advice Mr. Kovacs Received From Prior Counsel

23. Mr. Kovacs's criminal defense attorney in the underlying proceedings, Robert S. Fink, does not dispute that Mr. Kovacs instructed him to seek a plea agreement that would not result in any immigration consequences. Mr. Fink does not dispute that he misadvised Mr. Kovacs that misprision of felony, the reduced offense he negotiated with the government, would carry no immigration consequences. In light of his misunderstanding of the law, prior to sentencing, Mr. Fink repeatedly moved, and received permission from the Court, for Mr. Kovacs to travel internationally for business purposes.

24. During Mr. Kovacs's Rule 11 plea colloquy, Mr. Fink stated on the record: "[W]e are confident that misprision of felony is not deportable." Mr. Fink's advice was incorrect, however, as the government defines misprision of felony as a crime of moral turpitude, rendering Mr. Kovacs inadmissible to the United States.

25. Demonstrating his reliance upon the advice of counsel, after his plea and sentence, Mr. Kovacs continued to travel internationally for business without incident approximately three to four times per year. In April 2009, several years after he had completed his probation, Mr. Kovacs was stopped in Florida when he attempted to re-enter the United States. Because Mr. Kovacs was a permanent legal resident, the Department of Homeland Security did not keep him in custody and instead released him and scheduled an interview to evaluate his immigration status. After consulting extensively with criminal and immigration counsel and based on their advice, Mr. Kovacs voluntarily departed the United States in June 2009, shortly before his scheduled interview, to avoid likely detention and deportation.

### VI. Mr. Kovacs's Efforts to Seek Relief

26. Prior to his voluntary departure from the United States before his interview with the Department of Homeland Security, Mr. Kovacs consulted with criminal and immigration counsel but was not advised that a procedural mechanism existed to withdraw his guilty plea. Nonetheless, he continued his efforts to return home in a lawful manner. He, his wife, and his son Drew repeatedly contacted counsel over the course of the following two years in an effort to obtain relief.

27. Despite these efforts, Mr. Kovacs was not advised until October 2011 that a procedural mechanism was available to him under Federal law to seek vacatur of his conviction. Immediately thereafter, Mr. Kovacs hired new counsel and, on November 15, 2011, his counsel contacted the United States Attorney's Office on his behalf to try to negotiate an agreed upon motion for a writ of error coram nobis. Negotiations with the United States Attorney's Office, which included an in-person meeting and the exchange of legal authorities in support of the relief Mr. Kovacs was seeking, concluded unsuccessfully on April 13, 2012. Mr. Kovacs filed this petition shortly thereafter.

28.     Mr. Kovacs's persistent efforts to resume a normal life with his wife, children and grandchild in the United States are particularly notable in light of the clinical anxiety and depression from which he suffers. Mr. Kovacs was evaluated for posttraumatic stress disorder prior to sentencing. As noted in the PSI Report, Mr. Kovacs's experience as the child of Holocaust survivors left him with "scarring [that] is real and should not be ignored or underestimated." Specifically, the report stated: "he suffers terribly inside from anxiety and depression."

29.     Further, the psychologist warned: "It is my opinion that to be 'deported' back to Australia would probably greatly exacerbate Mr. Kovac's [sic] anxiety and depression." Indeed, Mr. Kovacs has suffered severe anxiety and depression since leaving the United States. Nonetheless, he has pursued legal relief diligently, acted quickly after being advised of a procedural mechanism through which to challenge his conviction, and has never sought to enter the United States unlawfully.

## PRAYER FOR RELIEF

30.     In light of the foregoing, Mr. Kovacs respectfully asks that this Court issue a writ of error coram nobis vacating his conviction and sentence and such other and further relief as this Court deems just and proper.

Dated: New York, New York
May 8, 2012

                Respectfully submitted,

                BOIES, SCHILLER & FLEXNER LLP

                By: _____

                Nicholas A. Gravante, Jr.
                *(ngravante@bsfllp.com)*
                Thomas M. Ling
                *(tling@bsfllp.com)*

                575 Lexington Avenue, 7th Floor
                New York, New York  10022
                Telephone:  (212) 446-2300

                *Attorneys for Petitioner Stephen Kovacs*